UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHARLES GARNER,

                Petitioner,

  v.

GABRIELA NAJERA,[1] *et al.*,

             Respondents.

Case No. 3:18-cv-00525-MMD-CSD

ORDER

## I.     SUMMARY

Petitioner Charles Garner has filed a counseled Second Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 29 ("Petition").) For the reasons discussed below, the Court denies the Petition and a certificate of appealability, and directs the Clerk of Court to enter judgment accordingly.

## II.    BACKGROUND

Garner's convictions are the result of events that occurred in Clark County, Nevada, on March 29, 2008. Evidence from the guilt and sentencing phases tends to show that Anthony Wright and Roanna Garner, Garner's wife, were driving to a parking lot near Roanna's work at a restaurant called the Juke Joint when Garner fired several shots from a handgun into their vehicle. (ECF No. 37-38 at 9.) Wright and Roanna were both injured. (*Id.*) Wright died at the scene from his wounds. (*Id.*) Roanna persisted in a vegetative state until she died in 2014. (ECF No. 38-14 at 86.) Garner was an ex-felon on the date of the crimes, having been convicted in 1992 of trafficking cocaine—a class B felony under the laws of the State of Massachusetts. (ECF No. 37-38 at 9-10.)

---

[1]The Nevada Department of Corrections inmate database states that Garner is incarcerated at Southern Desert Correctional Center. Gabriela Najera is the current warden for that facility. At the end of this order, this Court directs the Clerk of Court to substitute Gabriela Najera as a respondent for Respondent State of Nevada. *See* Fed. R. Civ. P. 25(d).

1          On January 6, 2009, Garner was charged in the Eighth Judicial District Court for

2   Clark County, Nevada, ("state court") under an amended information with first-degree

3   murder with the use of a deadly weapon; discharging a firearm at or into a structure,

4   vehicle, aircraft, or watercraft; attempted murder with the use of a deadly weapon; battery

5   constituting domestic violence with the use of a deadly weapon resulting in substantial

6   bodily harm; and possession of a firearm by a felon. (ECF No. 37-11.) Garner entered a

7   guilty plea to all charges. (ECF No. 37-39.) On May 3, 2013, Garner moved to withdraw

8   his guilty plea. (ECF No. 37-40.) The state court denied the motion after an evidentiary

9   hearing. (ECF Nos. 38-8, 38-10.) And on June 10, 2014, Garner was convicted under the

10  guilty plea of all charges. (ECF No. 38-17.)

11         The state court sentenced Garner to consecutive sentences of life without the

12  possibility of parole for the first-degree murder conviction plus a consecutive term of 20

13  years for the deadly weapon enhancement, 28-72 months for the discharging a firearm

14  conviction, eight to 20 years for the attempted murder conviction plus a consecutive term

15  of 20 years for the deadly weapon enhancement, six to 15 years for the battery conviction,

16  and 28-72 months for the possession of a firearm by an ex-felon conviction. (ECF No. 38-

17  17.) Garner appealed, and the Nevada Supreme Court affirmed. (ECF No. 38-26.)

18         Garner then filed a *pro se* state petition for writ of habeas corpus ("state petition")

19  seeking postconviction relief. (ECF No. 38-28.) The state court denied the petition without

20  an evidentiary hearing on April 16, 2019. (ECF No. 38-34.) Garner appealed. (ECF

21  No. 38-37.) The Nevada Supreme Court affirmed the state court's denial of relief on

22  January 23, 2020. (ECF No. 38-45.) Garner moved for reconsideration, which the Nevada

23  Supreme Court denied. (ECF No. 38-47.) And the remittitur issued on March 13, 2020.

24  (ECF No. 38-48.)

25         While Garner's state petition was pending, on October 29, 2018, he initiated this

26  federal habeas corpus proceeding *pro se* by submitting his original federal habeas petition

27  for filing. (ECF No. 1-1.) On February 26, 2018, this Court ordered the petition to be

28  docketed and served on Respondents. (ECF Nos. 11, 12.) After this Court granted

1    Garner's motion seeking appointment of counsel, Garner filed a counseled "protective"

2    first amended petition that was docketed on August 15, 2019. (ECF Nos. 15, 18.) And on

3    Garner's motions, the Court stayed this action pending final resolution of Garner's state

4    postconviction habeas proceeding, granted him leave to file a second amended petition,

5    and administratively closed this action. (ECF Nos. 19, 21, 24.)

6         On Garner's motion, the Court reopened this action on May 7, 2020. (ECF No. 27.)

7    Garner filed his Second Amended Petition on September 8, 2020. (ECF No. 29.)

8    Respondents moved to dismiss the Petition. (ECF No. 36). The Court denied

9    Respondents' motion and ordered them to answer the Petition. (ECF No. 46.) The

10   Respondents answered the Petition and Garner replied. (ECF Nos. 48, 49.)

11        Garner asserts three grounds for relief in the Petition:

12            1.  Garner's guilty plea was not voluntary because his trial counsel did not

13                inform him that his children had a right to speak at sentencing, and his

14                guilty plea would not take that right away from them.

15            2.  The trial court allowed—and was influenced by—highly prejudicial and

16                inappropriate victim-impact testimony at sentencing.

17            3.  Garner's trial counsel failed to present mitigating evidence about the

18                circumstances of the shooting, the victims' prior bad acts, his state of

19                mind, and his mental health and drug use histories.

20   (ECF No. 29.) The Court will address each ground in turn.

21   **III.   LEGAL STANDARD**

22        The standard of review generally applicable in habeas corpus cases is set forth in

23   the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

24       An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect
25       to any claim that was adjudicated on the merits in State court proceedings
         unless the adjudication of the claim—

26       (1) resulted in a decision that was contrary to, or involved an unreasonable
27       application of, clearly established Federal law, as determined by the
         Supreme Court of the United States; or

28       (2) resulted in a decision that was based on an unreasonable determination
         of the facts considering the evidence presented in the State court

3

1    proceeding.

2    28 U.S.C. § 2254(d). "'[C]learly established Federal law' for purposes of § 2254(d)(1)

3    includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'"

4    *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505

5    (2012)). A state court decision is "contrary to" clearly established federal law if it applies

6    a rule that contradicts the governing law established in Supreme Court cases or if the

7    decision addresses facts materially indistinguishable from a Supreme Court case but

8    reaches a different conclusion. *Brown v. Payton*, 544 U.S. 133, 141 (2005).

9        A state court decision is an unreasonable application of clearly established Federal

10    law "if the state court identifies the correct governing legal principle from [the Supreme]

11    Court's decisions but unreasonably applies that principle to the facts of the prisoner's

12    case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams v. Taylor*, 529 U.S.

13    362, 413 (2000)). An "'unreasonable application of' those holdings must be 'objectively

14    unreasonable,' not merely wrong; even 'clear error' will not suffice." *White*, 572 U.S. at

15    419 (quoting *Lockyer*, 538 U.S. at 75-76). Where no Supreme Court decision squarely

16    addresses "the specific question presented" by a habeas petitioner, the state court's

17    decision cannot be contrary to, or an unreasonable application of, Supreme Court

18    precedent. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (quoting *Lopez v. Smith*, 574 U.S.

19    1, 4 (2014) (per curiam)); *see also Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008);

20    *but see Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) ("[T]he lack of a Supreme Court

21    decision on nearly identical facts does not by itself mean that there is no clearly

22    established federal law, since 'a general standard' from this Court's cases can supply

23    such law.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

24        To obtain federal habeas relief, "'a state prisoner must show that the state court's

25    ruling on the claim being presented in federal court was so lacking in justification that

26    there was an error well understood and comprehended in existing law beyond any

27    possibility for fairminded disagreement.'" *White*, 572 U.S. at 419-20 (quoting *Harrington*

28    *v. Richter*, 562 U.S. 86, 103 (2011)); *see also Yarborough*, 541 U.S. at 664. The Supreme

4

1   Court has explained "that even a strong case for relief does not mean the state court's

2   contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102 (citing *Lockyer*, 538 U.S.

3   at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard

4   as "difficult to meet" and "highly deferential," which "demands that state-court decisions

5   be given the benefit of the doubt" (internal quotation marks and citations omitted)).

6   **IV.    DISCUSSION**

7        **A.    Ground 1—involuntary plea**

8        Garner argues in Ground 1 that his due process rights under the Fifth and

9   Fourteenth Amendments were violated because his guilty plea was not voluntary. (ECF

10  No. 49 at 4-11.) Garner incorrectly believed that entering the plea would protect his

11  children from testifying in court in any capacity. (*Id.* at 4, 6.) Respondents argue this claim

12  lacks merit because Garner does not contend that the State made any unkept promises

13  about his children not testifying during sentencing, and the state court correctly found that

14  all four grounds Garner raised for withdrawing his plea were belied by the evidence,

15  including this ground. (ECF No. 48 at 6.) The Nevada Supreme Court's order affirming

16  the state court's judgment of conviction is the last reasoned decision on this issue. (ECF

17  Nos. 38-26.)

18        **1.    Background**

19        On the advice of his attorneys, Garner signed an agreement pleading guilty to all

20  charges. (ECF No. 37-39.) Garner also agreed "not to argue for a term of years." (*Id.* at

21  3.) In exchange for Garner's guilty plea and agreement, the State agreed "not to seek the

22  death penalty." (*Id.*) The state court conducted the plea canvass on March 21, 2013. (ECF

23  No. 37-38.) Finding that Garner's guilty plea was freely, voluntarily, and knowingly made,

24  the state court accepted it. (*Id.* at 10.)

25        On April 29, 2013, Garner filed a *pro per* motion to withdraw his guilty plea arguing,

26  among other things, that his trial "counsel never informed him that his two . . . children

27  would be called on to testify against him during the sentencing hearing. Had [Garner]

28  known of this he would not have taken the plea." (ECF No. 37-40 at 6.) The state court

appointed separate counsel to represent Garner in seeking to withdraw his plea. (ECF No. 37-3 at 20.) On August 28, 2013, Garner filed a counseled supplemental motion to withdraw his guilty plea. (ECF No. 38-2.)

On October 22, 2013, the state court conducted an evidentiary hearing in which it heard testimony from Garner and his plea counsel. (ECF No. 38-8.) Garner testified that plea counsel discussed with him the fact that the State would call witnesses at the penalty hearing, which could include family members. (*Id.* at 18.) Garner was against his children testifying at the penalty hearing. (*Id.* at 19.) Garner recounted that he and plea counsel discussed that Garner's children "wouldn't be called on to testify, they wouldn't have to go through any of that if I took the deal." (*Id.* at 23.)

One of Garner's plea counsel testified he recalled discussing with Garner what the sentencing hearing would look like if he took the plea, including "the fact that victims and next of kin of victims would be allowed to come in and testify at that kind of hearing about the impact that situation had had on them." (*Id.* at 65.) Plea counsel recalled discussing Garner's children only in context of the advantages to pleading guilty: "one of the main advantages in a defendant pleading guilty and being able to present a sentencing argument to a court for less than the maximum sentence is that by pleading guilty a defendant is sparing family members the ordeal of having to testify at trial and be cross-examined." (*Id.* at 66.) Plea counsel did not recall discussing Garner's children in context of them speaking at the sentencing hearing. (*Id.* at 73.)

Plea counsel testified that after the plea was entered, he met with Garner and discussed the notice from the State about witnesses it would present at the sentencing hearing. (*Id.*) The notice included the two children Garner had with Roanna, and Garner was "very clear" he didn't want them to testify. (*Id.*) Garner stated he thought his children would not have to testify because of the plea agreement. (*Id.*) Kane responded that "[a]s relatives of a victim and as statutorily defined victims, they're allowed to speak their [peace] at a sentencing hearing and there is no way for [Garner or his attorneys] to prevent 'em from doing it." (*Id.* at 74-75.) Kane explained that their testimony at a

6

1  sentencing hearing would be "far different" from what their testimony would have been

2  had there been a trial. (*Id.* at 78.)

3    Garner's other plea counsel recalled Garner raising the issue of whether his

4  children would testify only after he signed the plea agreement. (*Id.* at 91.) Plea counsel

5  also recalled that he and Kane discussed with Garner how his sentencing would occur if

6  he signed the plea agreement. (*Id.*) Specifically, "that victims always have a right to

7  speak." (*Id.*) They could provide sworn testimony, present letters, or give a statement.

8  (*Id.*) Plea counsel recalled discussing this with Garner before he signed the plea

9  agreement. (*Id.* at 91-92.)

10    After Garner signed the agreement, plea counsel recalled Garner expressing that

11  he didn't want his children to be witnesses at the sentencing hearing. (*Id.* at 97.) Plea

12  counsel testified he responded by explaining that "they always have that right, . . . they're

13  not required to speak and they're certainly not required to provide letters or anything in

14  that regard." (*Id.*) Reed summarized, "[s]o the conversation was, in essence, they can do

15  it, but we would hope that they wouldn't do it." (*Id.*)

16    The evidentiary hearing was continued to November 21, 2013, and, after reviewing

17  the evidence, the state court found there was "no substantial, fair, or just reason to allow

18  [Garner] to withdraw his plea" because the four grounds he raised were "belied by the

19  evidence . . ." (ECF No. 38-9 at 34.) On December 18, 2013, the state court entered a

20  written order denying Garner's motion to withdraw his plea. (ECF No. 38-10.)

21      **2.**  **State court decision**

22    Garner appealed, arguing the state court abused its discretion in denying his

23  motion to withdraw his guilty plea. (ECF No. 38-22 at 23.) The Nevada Supreme Court

24  affirmed that the state court did not abuse its discretion, and in doing so addressed

25  Garner's argument that his plea was not voluntary because he mistakenly believed that

26  his children would not testify at sentencing if he pleaded guilty:

27     Appellant Charles Garner, III, argues that the district court abused its
   discretion in denying his motion to withdraw his guilty plea. A district court

28     may grant a presentence motion to withdraw a guilty plea for any substantial
   reason that is fair and just. *Crawford v. State*, 117 Nev. 718, 721, 30 P.3d

1123, 1125 (2001). "To determine whether the defendant advanced a substantial, fair, and just reason to withdraw a plea, the district court must consider the totality of the circumstances to determine whether the defendant entered the plea voluntarily, knowingly, and intelligently." *Id.* at 721–22, 30 P.3d at 1125-26; *see also State v. Freese*, 116 Nev. 1097, 1105–06, 13 P.3d 442, 448 (2000). In reviewing the district court's determination, we presume that the district court correctly assessed the validity of the plea, and we will not reverse "absent a clear showing of an abuse of discretion." *Riker v. State*, 111 Nev. 1316, 1322, 905 P.2d 706, 710 (1995) (internal quotation marks omitted).

Garner contends that he mistakenly believed that his children would not testify if he pleaded guilty and, if he had known that his children could testify at the sentencing hearing, he would have proceeded to trial. We conclude that the district court did not abuse its discretion in denying Garner's motion to withdraw his guilty plea. At the evidentiary hearing, counsel testified that they informed Garner, who was subject to the death penalty, that one of the benefits of pleading guilty is to spare witnesses the ordeal of having to testify and be cross-examined at trial and the penalty phase. Counsel testified that they spoke to Garner about the differences between a penalty hearing and a sentencing hearing and denied telling him that his children would not testify at the sentencing hearing if he pleaded guilty. The district court declined to allow Garner to withdraw his guilty plea because Garner received a substantial benefit in pleading guilty—the State agreed not to seek the death penalty in exchange for his guilty plea—and because withdrawal of the plea would subject Garner to the death penalty and make it more likely that his children would have to testify against him. We conclude that the district court did not abuse its discretion in deciding that Garner's mistaken belief about whether his children could testify was not a "substantial, fair, and just reason" to withdraw his plea. *See Crawford*, 117 Nev. at 721, 30 P.3d at 1125. Further, considering the totality of the circumstances, we conclude that the district court's plea canvass, coupled with the written plea agreement, demonstrates that the plea was knowingly and voluntarily entered. *See Freese*, 116 Nev. at 1105–06, 13 P.3d at 448.

(ECF No. 38-26 at 2-3.)

Garner argued in his state habeas petition that his guilty plea was coerced by trial counsel. (ECF No. 38-28 at 7.) In affirming the state court's denial of that claim without conducting an evidentiary hearing, the Nevada Supreme Court explained, "[t]o the extent that this argument is related to the claim raised in [Garner's] presentence motion to withdraw a guilty plea that he was not aware his children would testify at the sentencing hearing, this claim was considered and rejected on direct appeal." (ECF No. 38-45 at 4.)

### 3.      Legal standard

A guilty plea that is not voluntary and knowing violates due process and is void. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969). This is because a guilty "plea

is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* The voluntariness of a guilty plea "can be determined only by considering all of the relevant circumstances surrounding it." *Id.*

The Supreme Court has explained that the standard of voluntariness requires that the person entering a guilty plea be "fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel," and the plea "must stand unless" it has been "induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Id.* at 755 (quotation omitted). "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Henderson v. Morgan*, 236 U.S. 637, 645 n.13 (1976). "To determine the voluntariness of the plea, [courts] look to the totality of the circumstances, examining both the defendant's 'subjective state of mind' and the 'constitutional acceptability of the external forces inducing the guilty plea.'" *Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007) (quoting *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986)).

Whether a guilty plea is "voluntary for purposes of the federal constitution is a question of federal law and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d)." *Marshall v. Lonberger*, 459 U.S. 422, 431 (1983) (internal citation omitted). "But questions of historical fact" and inferences properly drawn from them "are obviously questions of 'fact' governed by the provisions of § 2254(d)." *Id.* at 431-32. "In general, an issue that involves inquiry into a state of mind may be considered a question of fact."

1    *Lambert v. Blodgett*, 393 F.3d 943 (9th Cir. 2004) (citing *Miller v. Fenton*, 474 U.S. 104,

2    113 (1985)). Thus, state court findings about a petitioner's comprehension of the nature

3    and consequences of his guilty plea are presumed correct in a habeas corpus proceeding

4    unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28

5    U.S.C. § 2254(e)(1).

6               **4.    Analysis**

7               In assessing Garner's claim that his plea was not voluntary, this Court considers

8    the record that was before the Nevada Supreme Court when it adjudicated this claim on

9    direct appeal. *See Cullen*, 563 U.S. at 181. Garner contends that his plea was not

10   voluntary because he "was clearly induced . . . by assurances about the impact of the

11   case on his children"—specifically, that his children would not testify in any capacity. (ECF

12   No. 29 at 6.) Garner argues in his reply brief that precluding his children from testifying in

13   any capacity was a "direct" consequence of his plea. (ECF No. 49 at 4.)

14              "[A] plea of guilty can be voluntary only if it is 'entered by one fully aware of the

15   *direct* consequences' of his plea." *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986)

16   (quoting *Brady*, 397 U.S. at 755). Direct consequences have "a definite, immediate and

17   largely automatic effect on the range of the defendant's punishment." *Torrey v. Estelle*,

18   842 F.2d 234, 236 (9th Cir. 1988) (quotation omitted). Collateral consequences, on the

19   other hand, are "contingent upon actions taken by an individual or individuals other than

20   the sentencing court—such as another governmental agency or the defendant

21   himself . . ." *United States v. Littlejohn*, 224 F.3d 960, 965 (9th Cir. 2000). The possibility

22   that Garner's children would exercise their right to testify at the sentencing hearing[2] and

23   offer testimony unfavorable to him does not have a definite, immediate, and largely

24   automatic effect on his range of punishment. Indeed, the decision whether to testify at the

25   sentencing hearing rests in each victim's hands, not with the sentencing court, so it is not

26

27               [2] *See* NRS § 176.015(3) (Eff. July 1, 2009, to June 7, 2017) (providing that the "the
     court shall afford the victim an opportunity to" appear personally or through counsel or a
28   representative and "[r]easonably express any views concerning the crime, the person
     responsible, the impact of the crime on the victim[,] and the need for restitution").

1   a direct consequence of Garner's plea. That Garner misunderstood a collateral

2   consequence of his guilty plea does not render it involuntary. *See Brady*, 397 U.S. at 757

3   (explaining "[t]he rule that a plea must be intelligently made to be valid does not require

4   that a plea be vulnerable to later attack if the defendant did not correctly assess every

5   relevant factor in entering into his decision").

6           In any event, the plea agreement contains no assurance that Garner's children

7   would not testify during the sentencing hearing. During the plea canvas, Garner testified

8   that no promises other than those stated in the plea agreement were made to get him to

9   enter into the agreement. (ECF No. 37-38 at 6.) Garner's representations during the

10  colloquy "constitute a formidable barrier" in this proceeding. *See Blackledge v. Allison*,

11  431 U.S. 63, 74 (1977). The Supreme Court has explained that "[s]olemn declarations in

12  open court carry a strong presumption of verity." *Id.*; *accord Muth v. Fondren*, 676 F.3d

13  815, 821 (9th Cir. 2012). And "[t]he subsequent presentations of conclusory allegations

14  unsupported by specifics is subject to summary dismissal, as are contentions that in the

15  face of the record are wholly incredible." *Blackledge*, 431 U.S. at 74.

16          The only evidence supporting Garner's argument that he was misled is his self-

17  serving testimony during the state court evidentiary hearing that his counsel told him that

18  if he took the plea, his children "wouldn't be called on to testify, they wouldn't have to go

19  through any of that if I took the deal." (ECF No. 38-8 at 23.) But Garner's plea counsel

20  testified they explained to Garner that if he took the plea, "victims and next of kin of victims

21  would be allowed to come in and testify at [a sentencing] hearing about the impact that

22  situation had on them." (*Id.* at 64-65.) One counsel did not recall Garner's children being

23  discussed in that context. (*Id.* at 65.) But he did recall explaining to Garner that "one of

24  the main advantages in a defendant pleading guilty and being able to present a

25  sentencing argument to a court for less than the maximum sentence is that by pleading

26  guilty a defendant is sparing family members the ordeal of having to testify at trial and be

27  cross-examined." (*Id.* at 65-66.) The other counsel recalled explaining to Garner before

28  he signed the plea agreement that "victims always have a right to speak" at sentencing.

1   (*Id.* at 91.) Plea counsel summarized: "[s]o the conversation was, in essence, they can

2   do it, but we would hope that they wouldn't do it." (*Id.*) The Nevada Supreme Court

3   credited the attorneys' testimony that they did not represent to Garner that his children

4   would not testify in any capacity if he entered the plea.

5          Based on this record, the Nevada Supreme Court reasonably determined that

6   Garner did not misunderstand the direct consequences of his guilty plea. And it

7   reasonably applied U.S. Supreme Court authority in determining that Garner's guilty plea

8   was knowingly and voluntarily entered. *See* 28 U.S.C. § 2254(d); *see also White*, 572

9   U.S. at 419-20 (explaining "'a state prisoner must show that the state court's ruling on the

10  claim being presented in federal court was so lacking in justification that there was an

11  error well understood and comprehended in existing law beyond any possibility for

12  fairminded disagreement'"). Garner therefore is not entitled to federal habeas relief for

13  Ground 1.

14         **B.     Ground 2—victim-impact evidence**

15         Garner argues in Ground 2 that his due process rights under the Fifth and

16  Fourteenth Amendments were violated when the state court allowed and was influenced

17  by highly prejudicial statements that victims Kristina Wright, Ja. T, and Jo. T[3] gave at

18  sentencing. (ECF No. 29 at 11-15.) Respondents argue that this claim fails because

19  Garner has not demonstrated that the state court applied clearly established federal law

20  to the facts in an objectively unreasonable manner. (ECF No. 48 at 9-12.) They also

21  argue Garner has not established that he was prejudiced by the errors he complains

22  about. (*Id.* at 12.) The Nevada Supreme Court's order affirming the state court's judgment

23  of conviction is the last reasoned decision on this ground. (ECF No. 38-26.)

24         **1.     Background**

25         Garner was convicted under a guilty plea of murdering Wright and attempting to

26

27         [3]This Court refers to minor children only by their initials. *See* LR IC 6-1(a)(2).

28  Although one of Roanna's children might have been 19 when he testified during the
    sentencing hearing, the parties did not use that victim's name in referring to his testimony
    in their pleadings. So this Court does the same.

1  murder his wife Roanna—they were separated at the time—by shooting multiple rounds

2  from a handgun into Roanna's car, which Wright was driving Roanna to work in. The state

3  court conducted a sentencing hearing on May 29, 2014. (ECF No. 38-14.) Kristina Wright,

4  Wright's wife and the mother of their son, testified that Garner "didn't take into

5  consideration the lives that he was ruining, and I don't feel that he should be able to have

6  freedom again. I don't feel like for the victims of the people that are in here, that wouldn't

7  be fair. He knew what he was doing. You don't wake up at 8:00 o'clock in the morning

8  and go do that not knowing what you're doing." (*Id.* at 27.) Garner's counsel objected "to

9  discussion of the facts." (*Id.*) The state court overruled the objection. (*Id.*)

10        Roanna's oldest daughter, Ja. T., testified that Garner planned to kill Roanna

11  based on a conversation she had with him two days before the crimes. (*Id.* at 74.) She

12  also testified: "Who knows what else he's capable of or who else is on his hit list." (*Id.*)

13  Garner's counsel objected "[t]hat's not proper victim impact statement." (*Id.*) Ja. T

14  continued, "He deserves life in prison." (*Id.*) Again Garner's counsel objected. (*Id.*) The

15  state court overruled the objection. (*Id.*) Ja. T continued, "He deserves life in prison

16  without parole. Nobody's life should be at stake. Sending him to prison is one less

17  murderer on the streets. Thank you." The state court thanked Ja. T and expressed

18  sympathy for her loss. (*Id.*)

19        Roanna's second oldest son, Jo. T, testified:

20      And first off, before the letter, I would like to know -- would like to let you
    know that my experience with Charles growing up having him be the father
21      figure that he wanted to be in my life, he was normal, absolutely normal,
    worked out every day, played basketball, never seen no drugs. The only
22      thing I do recall is anger outburst, multiple, at many, many of my family
    member and as well as my mom's parents were aware of the situation of
23      him hitting my mom.

24  (*Id.* at 75.) Garner's counsel objected that the testimony exceeded the bounds of victim

25  impact statements. (*Id.*) The state court overruled the objection. (*Id.*) Jo. T continued:

26  "Beyond beating my mom, and physically abusing us and our family. I feel that what he

27  done was never deserved, but it happened, and that he needs to pay for the crimes he's

28  done, and justice needs to be served. That is all in regards to that." (*Id.*)

13

1   Jo. T later testified, "This man is a [sic] animal—" (*Id.* at 76.) While Garner's

2   counsel objected, Jo. T completed his statement that Garner was "not an American in my

3   eyes." (*Id.*) Garner's counsel pointed out that "it is improper for a speaker to make

4   statements like that about the defendant, Your Honor." (*Id.*) The state court agreed,

5   instructing Jo. T that counsel's "got a point which you're not supposed to come in here

6   and call people names. Can you just kind of . . . be more factual." (*Id.* at 76-77.)

7   Jo. T said "[o]kay[,]" and then testified that "[a] person [who] does something of

8   that nature is not an American in my eyes. He is worse than a terrorist." (*Id.* at 77.)

9   Garner's counsel again objected, pointing out that "[r]eferences to the defendant and his

10  opinion of the defendant is not proper victim impact statement, and if he's written this out,

11  and the prosecutor's aware that he was going to make [these] statements, then I have

12  further objection." (*Id.*) The state court again instructed Jo. T, "[s]o, I mean, again, the

13  issue here is, you know, the word terrorist, it sort of sounds like you're calling people

14  names. We're trying to be, you know, professional. Can you sort of stick with the facts

15  and how it affected you, that kind of thing?" (*Id.*) Jo. T responded "[y]es, sir." (*Id.*)

16  Jo. T continued and eventually testified:

17  He's verbally, physically abused my mom, sometimes even in front of us.
    My mom tried getting away. The law can see evidence leading up to it,
18  restraining orders, phone call. He stopped her and followed her from work.
    There's a couple of times I remember my mom driving two laps around the
19  block, just so she wouldn't know that he was following her before coming
    home. He would not stop making threats. That should have caught
20  attention, but they were ignored. She had a plan. He messed everything up
    trying to control another person's freedom as well as their children's
21  freedom.

22  Life will never be the same. There was nothing in my power I can do to
    control the situation. All I know is I will never have my mother back in my
23  life. My little brother and sister will never have no mother or father. A man
    who builds respect in County jail and still to this day calls himself
24  Gunner . . .

25  (*Id.* at 78.) Garner's counsel objected. (*Id.*) The state court overruled the objection. (*Id.*)

26  And Jo. T continued his sentence that Garner "calls himself Gunner and gloats around

27  the County jail of being somebody that killed another person is insane to me." (*Id.*)

28  Jo. T also testified,

14

By all means this man is an American disgrace. He doesn't deserve freedom, but death. He made signs before attempting the act. He even told my sister he doesn't want us living with our mom, but we should be with our grandma. Never in my life was there a time my mouth wasn't fed, clothes not on my back, shelter was the least of our worries. My mom had four kids dealing with a beast. Without him, she could have still handled us and took care of her seeds.

He hurt two families that day, but as my mom's pain comes to ease, and she finds peace, my heart will always find comfort today. This morning at 11 :10 a.m., she let go after fighting six long years. He shot my mother in the back of the head twice and still fought to that day.

(*Id.* at 80.)

Jo. T testified that Garner is "a compulsive liar[,]" Garner's counsel objected, and while the state court was speaking, Jo. T continued that Garner was "an abusive negligent piece of trash, who wants to be set free one day—" (*Id.* at 80-81.) At this point the state court instructed Jo. T:

Let me—hang on. I want you to listen for one second. Hang on. I want you to understand, all right, I'm here because I want very much to hear you have to say. I just want you to understand where I'm coming from. A minute ago, Mr. Garner spoke. You heard him speak, right? If he had tried to say something disrespectful about your mother, I would have stopped him. If he tried to call you a name, I would have stopped him, so in return, you know, I would—I would, you know, hope that if, you know, that you don't call him names as well.

If he had done that, I would have been all over him, okay.

(*Id.* at 81.) Jo. T responded that he understood. (*Id.*) And the state court reiterated;

I want you to understand that's where I'm coming from. I'm not—I want to hear what you have to say. I'm not trying to get you to stop talking, but, you know, things like that, I expect a certain level of decorum from everybody, including from Mr. Garner and his attorney. Do you understand where I'm coming from?

(*Id.*) Jo. T again confirmed he understood. (*Id.*) Jo. T concluded his testimony by saying that Garner planned the crime and hypothesizing that Garner would have kidnapped his children if he had not been caught so soon afterward. (*Id.*) The state court thanked Jo. T and expressed sorrow for his loss. (*Id.* at 82.)

The state court also told Jo. T it understood why he said some things, "but I just hope you understand that the name calling, it just—it's going to create this whole thing,

15

you know, into a—into a kind of free-for-all." (*Id.*) Jo. T responded that he was "never aware of that back then." (*Id.*) The state court replied:

> I know. I'm not mad at you. I just want you—I'm not mad at you. I'm not. I understand completely where you're coming from, but just, you know—it just—it drops the level of the proceedings down into just this whole kind of free-for-all kind of thing. Okay. So, I want you to understand, I'm not mad at you. I totally understand where you're coming from. I understand that, you know, you have, obviously, you're very emotional. You've never been in court before, I'm going to guess, but that's—you know. I just want—I want you to understand and feel comfortable about why I was a little uncomfortable with some of the words that you used. Okay? Understand that?

(*Id.*)

The state court stated at the close of sentencing:

> You know, justice is a funny word. People come to me and they ask me for justice, and sometimes I think if I even -- I wonder if I even have the power to do it. There are certain things that I can't do that I wish I could do. I wish I could bring these people back. I wish that I could heal your suffering. I wish that I could make them be there for all of you. I wish that I could, you know, get you guys the counseling that you need to do. I can't do any of that.
>
> All I can do is what the law permits me to, and in that sense, you know, what the law permits me to do, I don't know if it's going to help all of you or not. I don't know if it's going to let you sleep better or night -- at night or not. I have no idea, and so in that sense, maybe justice is something that only exists between Mr. Garner and God. All I can do is what the law permits me to do.

(*Id.* at 90.)

### 2.    State court decision

The Nevada Supreme Court rejected this claim, explaining:

> Next, Garner contends that his due process rights were violated when several victim impact speakers made unsupported factual allegations about his prior acts and one of the witnesses called him names. He contends that the district court failed to maintain decorum in the courtroom by allowing the speakers' testimony to exceed the scope of NRS 176.015(3) and that the State had an obligation to review the victim impact statements in advance to prevent this improper testimony. We disagree.
>
> While the speakers' statements contained some inappropriate remarks, we conclude that the remarks did not render the sentencing hearing fundamentally unfair. *See* NRS 176.015(3)(b) (providing that victims may "[r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution"). Notably, the district court asked one of the speakers to refrain from name-calling and explained the necessity to maintain decorum in the court. *See Dieudonne v. State,* 127___, ___, 245 P.3d 1202, 1208 (2011) (noting the district court's duty to maintain decorum during victim impact statements). There is no indication in the record that the district court based

1
2
3
4
5
6
7

its sentencing decision on any inappropriate language in the victim impact statements. *See Silks v. State,* 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976) (stating that reliance on impalpable or highly suspect evidence in sentencing is an abuse of discretion). Further, a "district court is capable of listening to the victim's feelings without being subjected to an overwhelming influence by the victim in making its sentencing decision." *Randell v. State,* 109 Nev. 5, 8, 846 P.2d 278, 280 (1993). To the extent that Garner contends that the State failed to provide reasonable notice as to the contents of the impact statements, he has failed to demonstrate that he was prejudiced or deprived of an opportunity to rebut the impact statements. *See generally Buschauer v. State,* 106 Nev. 890, 894, 804 P.2d 1046, 1048-49 (1990) (discussing remedies for lack of reasonable notice that the victim impact statement would refer to specific prior acts).

8

(ECF No. 38-26 at 4-5.)

9

### 3. **Legal standard**

10

The Supreme Court held in *Payne v. Tennessee* "that if the State chooses to permit

11

the admission of victim impact evidence and prosecutorial argument on that subject, the

12

Eighth Amendment erects no *per se* bar." 501 U.S. 808, 827 (1991). "A State may

13

legitimately conclude that evidence about the victim and about the impact of the murder

14

on the victim's family is relevant to the jury's decision as to whether or not the death

15

penalty should be imposed." *Id.* The holding in *Payne* is expressly limited to overruling

16

the Supreme Court's precedent in *Booth v. Maryland* and *S. Carolina v. Gathers,* which

17

held that "evidence and argument relating to the victim and the impact of the victim's

18

death on the victim's family are inadmissible at a capital sentencing hearing." *Id.* at 830

19

n.2 (overruling in part *Booth v. Maryland,* 482 U.S. 496 (1987), and *S. Carolina v. Gathers,*

20

490 U.S. 805 (1989)). The Supreme Court also held in *Booth* that "the admission of a

21

victim's family members' characterizations and opinions about the crime, the defendant,

22

and the appropriate sentence violates the Eighth Amendment," but no such evidence was

23

presented in *Payne,* so *Payne* does not overrule *Booth* on that point. *Id. Booth,* however,

24

is expressly limited to capital cases. 482 U.S. at 509 n.12 ("We imply no opinion as to the

25

use of these statements in noncapital cases.").

26

The Supreme Court has instructed that "[i]n the event that evidence is introduced

27

that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process

28

Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne,* 501 U.S.

17

at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)). "The relevant question" in that context is whether the evidence "so infected the [proceeding] with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). As the Supreme Court concluded in *Payne*, "[t]here is no reason to treat [victim-impact] evidence differently than [how] other relevant evidence is treated." 501 U.S. at 827.

### 4. Analysis

At the time Garner was sentenced, Nevada law required the state court to "afford the victim an opportunity to: (a) [a]ppear personally, by counsel[,] or by personal representative; and (b) [r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution." NRS § 176.015(3) (Eff. July 1, 2009, to June 7, 2017). Nevada law defined "victim" to include "[a] relative of" "[a] person who has been injured or killed as a direct result of the commission of a crime . . ." NRS § 176.015(5)(d). Three victims opined that Garner planned to commit murder. Garner pleaded guilty to murder with the use of a deadly weapon, i.e., that he "did then and there willfully, feloniously, and without authority of law, and *with premeditation and deliberation, and with malice aforethought, and/or lying in wait,* kill ANTHONY WRIGHT, a human being, by the Defendant shooting at and into the body of the said ANTHONY WRIGHT, with a deadly weapon, to-wit: a firearm." (ECF No. 37-39 at 11 (emphasis added).)

Three victims testified that Garner should be sentenced without the possibility of parole, which was the high end of sentencing permitted by the plea agreement. Garner provided statements, letters, his own allocution, testimony from his doctors, and argument from his counsel advocating for life with parole. (ECF No. 38-14 at 29-71.) At the close of sentencing, the state court expressed its desire to "heal [the victims'] suffering" but repeatedly reminded everyone present that it was constrained by "what the law permits [it] to do . . ." (*Id.* at 90.)

Based on the record, one victim called Garner names like animal, terrorist, and

1   compulsive liar. Garner's counsel objected, and as the victim continued making

2   inappropriate comments, the state court increased its instruction to him. The state court

3   expressed that it wasn't "comfortable" with some of the language the victim used, said the

4   language fell below the "level of decorum" expected of everyone in the court room, was

5   disrespectful, and wouldn't be tolerated being said about anyone. The state court made

6   clear it would not permit a "free-for-all" during sentencing.

7         On this record, the Court finds that the Nevada Supreme Court's determination

8   constituted an objectively reasonable application of *Payne* and *Darden* that the victim-

9   impact statements did not render the sentencing hearing fundamentally unfair. Garner is

10  therefore not entitled to habeas relief on Ground 2.

11        **C.     Ground 3—ineffective assistance of counsel**

12        Garner argues in Ground 3 that his rights under the Sixth and Fourteenth

13  Amendments were violated because his counsel failed to present mitigating evidence in

14  its possession about the circumstances of the shooting, namely a surveillance video that

15  purportedly refutes the prosecution's theory that he had been lying in wait, evidence that

16  Roanna and Wright had bad characters, and evidence of Garner's drug use and mental

17  health issues. (ECF No. 29 at 16-34.) Garner argues that had his counsel presented this

18  evidence at sentencing, "it is possible that the [state] court would have given [him] the

19  possibility of parole" instead of life without the possibility of parole for the murder charge.

20  (ECF No. 49 at 23-24.) Garner acknowledges that this claim has not been exhausted and

21  is procedurally defaulted. (ECF Nos. 29 at 16, 49 at 17.) Respondents moved to dismiss

22  this claim on that ground. (ECF No. 36.)

23        This Court denied the dismissal motion, preferring to rule on the question of

24  whether default can be excused at the same time it decided the merits of Garner's claims.

25  (ECF No. 46.) The Court now determines if this claim is procedurally barred from federal

26  review. And it decides that question under a *de novo* standard of review. *See Fox v.*

27  *Johnson*, 832 F.3d 978, 985 (9th Cir. 2016) (applying *de novo* standard of review when

28  no state court has adjudicated the claim on the merits); 28 U.S.C. § 2254(d).

1

### 1.   Legal Standard—procedural default

2      The Supreme Court held in *Coleman v. Thompson* that a state prisoner who fails

3   to comply with a state procedural requirement in presenting his claims is barred by the

4   adequate and independent state ground doctrine from obtaining a writ of habeas corpus

5   in federal court. 501 U.S. 722, 731-32 (1991). "When the prisoner has failed to do so, and

6   the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'"

7   *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727 (2022). "To overcome procedural default, the

8   prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice'

9   if the federal court were to decline to hear his claim." *Id.* (quoting *Coleman*, 501 U.S. at

10  750). To establish cause, the prisoner must show that "some objective factor external to

11  the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*

12  *v. Carrier*, 477 U.S. 478 (1986). And to establish prejudice, "the prisoner must show not

13  merely a substantial federal claim, such that the errors at trial created a *possibility* of

14  prejudice, but rather that the constitutional violation worked to his *actual* substantial

15  disadvantage." *Ramirez*, 142 S. Ct. at 1733 (quotations omitted).

16     The Supreme Court explained in *Martinez v. Ryan* that a prisoner may establish

17  cause when "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel

18  claim in a collateral proceeding" but "the state courts did not appoint counsel in the initial

19  review collateral proceeding for a claim of ineffective assistance at trial." 566 U.S. 1, 14

20  (2012). This narrow exception applies to ineffective assistance of trial counsel ("IATC")

21  claims and has four factors:

22          (1) the claim of ineffective assistance of trial counsel [is] a substantial claim;
            (2) the cause consisted of there being no counsel or only ineffective counsel
23          during the state collateral review proceeding; (3) the state collateral review
            proceeding was the initial review proceeding in respect to the ineffective-
24          assistance-of-trial-counsel claim; and (4) state law *requires* that an
            ineffective assistance of trial counsel claim be raised in an initial-review
25          collateral proceeding.

26  *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (cleaned up) (quoting *Martinez*, 566 U.S. at

27  13-14). A procedural default will not be excused if the underlying ineffective assistance

28  claim "is insubstantial, i.e., it does not have any merit or that it is wholly without factual

20

1  support[.]" *Martinez*, 566 U.S. at 15-16 (emphasis omitted). The Supreme Court has

2  likened substantiality to the standard for issuing a certificate of appealability. *See id.* at

3  14. This means to overcome the default, a prisoner must demonstrate that "reasonable

4  jurists could debate whether . . . or . . . agree that[ ] the petition should have been

5  resolved in a different manner or that the issues presented were adequate to deserve

6  encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)

7  (quotation omitted).

8       Nevada law requires prisoners to raise ineffective assistance of counsel claims for

9  the first time in a state petition seeking postconviction review, which is the initial collateral

10 review proceeding for *Martinez* purposes. *See Rodney v. Filson*, 916 F.3d 1254, 1260

11 (9th Cir. 2019) (citing *Corbin v. State*, 892 P.2d 580, 582 (Nev. 1995)). Here, the state

12 courts did not appoint Garner counsel in his initial review collateral proceeding. (ECF

13 Nos. 38-34, 38-45.) The Court finds that Garner has established the second, third, and

14 fourth *Martinez* factors.

15            **2.    Application of 28 U.S.C. § 2254(e)(2)**

16       Garner appears to offer additional evidence that is not part of the state court record

17 to bolster his argument that his IATC claim is substantial. (ECF No. 30-27 at 2.)[4] The

18 Supreme Court recently held that if 28 U.S.C. § 2254(e)(2) "applies and the prisoner

19 cannot satisfy its 'stringent requirements,' a federal court may not hold an evidentiary

20 hearing—or otherwise consider new evidence—to assess cause and prejudice under

21 *Martinez*." *Ramirez*, 142 S. Ct. at 1739 (quoting *Williams*, 529 U.S. at 433). To consider

22 evidence first introduced in federal court, § 2254(e)(2) requires that:

23       (A) the claim relies on—

24            (i) a new rule of constitutional law, made retroactive to cases on
             collateral review by the Supreme Court, that was previously
25            unavailable; or

26            (ii) a factual predicate that could not have been previously discovered

27            ⁴Garner submitted 48 exhibits in support of his Petition. (ECF No. 30 at 2-5.) Only
28 five of those exhibits clearly appear in the state record: Dr. Kinsora's Assessment of
    Neurocognition (*compare* ECF No. 31-2, *with* ECF No. 38-12), and four photographs of
    Roanna's black BMW. (*Compare* ECF No. 30 at 4, *with* ECF No. 37-1 at 3.)

21

through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Section 2254(e)(2) "applies only when a prisoner 'has failed to develop the factual basis of a claim.'" *Ramirez*, 142 S. Ct. at 1734. The Supreme Court has interpreted "fail" "to mean that the prisoner must be 'at fault' for the underdeveloped record in state court." *Id.* (quoting *Williams*, 529 U.S. at 432). "A prisoner is 'at fault' if he 'bears responsibility for the failure' to develop the record." *Id.* (quoting *Williams*, 529 U.S. at 432). "[A] person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." *Williams*, 529 U.S. at 432. "Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. Generally, "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

Garner asserted ineffective assistance of trial counsel claims in his state habeas petition, but not the specific claim that he raises in Ground 3. (ECF No. 38-28 at 7.) Garner filed a *pro per* motion for an evidentiary hearing in conjunction with his state habeas petition. (ECF No. 38-31.) The state court denied the motion. (ECF No. 38-36.) Garner thus meets the minimum threshold for diligence.

However, a prisoner "who knew of the existence of information at the time of his state court proceedings, but did not present it until federal habeas proceedings, failed to develop the factual basis for his claim diligently." *Cook v. Kernan*, 948 F.3d 952, 971 (9th Cir. 2020) (quotations and brackets omitted). Before the sentencing hearing, Garner was aware of the facts of his and Mary's negative experiences with Roanna. Garner, in fact, argues that he provided this information to his trial counsel, which had evidence corroborating it in its files. (ECF No. 29 at 24.) But evidence about Roanna's arrest and

1    Garner's and Mary's other negative experiences with Roanna was not presented during

2    sentencing. And Mary did not testify during sentencing.

3         Despite Garner's knowledge about these facts, he failed to develop and pursue a

4    claim in state court that his counsel was ineffective for not raising evidence about them

5    during sentencing. Garner has not exercised diligence about these matters. *See Cook*,

6    948 F.3d at 971. So § 2254(e)(2)'s requirements apply to the new evidence about

7    Roanna's character. But § 2254(e)(2)(i) is not applicable and § 2254(e)(2)(ii) is not

8    satisfied because Garner was aware of these factual predicates of his claim before

9    sentencing, so review of the new evidence about them is foreclosed by *Ramirez*. So in

10   deciding whether Garner's IATC claim is substantial, the Court will not consider Garner's

11   complaint for divorce (ECF No. 30-4); emails and voice messages from Roanna to Mary

12   (ECF Nos. 30-13, 33, 34) (Exhibit 48 or 50 manually filed)); defense memoranda

13   summarizing interviews with Mary (ECF Nos. 30-16, 30-17); defense memorandum and

14   records about Roanna's 2004 arrest in Tuscon, AZ, for domestic violence (ECF No. 30-

15   20); defense memorandum summarizing Garner's timeline (ECF No. 30-14); Garner's

16   declaration dated August 21, 2020 (ECF No. 30-26); and memorandum and records

17   about Garner's hospital visits in Tuscon, AZ. (ECF No. 31-1.)

18         **3.    Legal standard—ineffective assistance of counsel**

19         The Sixth Amendment right to counsel includes "the right to the effective

20   assistance of counsel." *Garza v. Idaho*, 139 S. Ct. 738, 743–44 (2019) (quotation

21   omitted). To show that an IATC claim is "substantial" under *Martinez*, a prisoner must

22   demonstrate that (1) "counsel's representation fell below an objective standard of

23   reasonableness," and (2) "any such deficiency was 'prejudicial to the defense.'" *Garza v.

24   Idaho*, 139 S. Ct. at 743-44 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 692

25   (1984)). A court considering an ineffective assistance claim must apply a "strong

26   presumption that counsel's conduct falls within the wide range of reasonable professional

27   assistance." *Id.* at 689. The prisoner bears the burden of showing "that counsel made

28   errors so serious that counsel was not functioning as the 'counsel' guaranteed the

23

1    defendant by the Sixth Amendment." *Id.* at 687.

2         To establish prejudice under *Strickland*, it is not enough for the prisoner "to show

3    that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

4    Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial

5    whose result is reliable." *Id.* at 687. So the petitioner must show "there is a reasonable

6    probability that, but for counsel's unprofessional errors, the result of the proceeding would

7    have been different." *Strickland*, 466 U.S. at 694.

8         The constitutional right to effective assistance of counsel applies to sentencing.

9    *See id.* at 698-99 (concerning capital sentencing proceeding). The Ninth Circuit has

10   repeatedly held that "counsel has a duty to present and explain all available mitigating

11   evidence, absent a tactical reason for not doing so." *Demetrulias v. Davis*, 14 F.4th 898,

12   913 (9th Cir. 2021) (collecting cases). But the Supreme Court has cautioned that courts

13   "must indulge a strong presumption that counsel's conduct falls within the wide range of

14   professional assistance; that is, the defendant must overcome the presumption that,

15   under the circumstances, the challenged action might be considered sound trial strategy."

16   *Strickland*, 466 U.S. at 689 (internal quotation omitted); *Pinholster*, 563 U.S. at 191; *see

17   also Doleman v. State*, 921 P.2d 278, 280-81 (Nev. 1996) (stating that counsel's strategic

18   decisions are "virtually unchallengeable").

19        "'[T]he relevant inquiry under *Strickland* is not what defense counsel could have

20   pursued, but rather whether the choices made by defense counsel were reasonable.'"

21   *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Siripongs v. Calderon*,

22   133 F.3d 732, 736 (9th Cir. 1998)). "Judicial scrutiny of counsel's performance must be

23   highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney

24   performance requires that every reasonable effort be made to eliminate the distorting

25   effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

26   and to evaluate the conduct from counsel's perspective at the time." *Id.* "[S]trategic

27   choices made after thorough investigation of law and facts relevant to plausible options

28   are virtually unchallengeable; and strategic choices made after less than complete

24

1   investigation are reasonable precisely to the extent that reasonable professional
2   judgments support the limitations on investigation." *Id.* at 690-91.

3          **a.   Surveillance video, police reports, crime-scene photos**

4          Garner argues that his counsel failed to show the sentencing judge a video that
5   purportedly shows he pulled into the Juke Joint's parking lot about 30 seconds after
6   Wright and Roanna and was not, contrary to the State's theory, lying in wait for them.
7   (ECF No. 29 at 18.) Garner argues that police reports and crime-scene photos
8   corroborate his version of events that Roanna and Wright arrived in her black BMW car
9   before he arrived in Mary's truck. (*Id*. at 29-30.) Garner pleaded guilty to killing Wright
10   with "premeditation and deliberation, and with malice aforethought, *and/or* lying in wait."
11   (ECF No. 37-39 at 1, 11 (emphasis added), *accord* ECF No. 37-38 at 9.)[5] Either theory
12   of the crime allowed the state court to sentence Garner to either life with the possibility of
13   parole or life without the possibility of parole, among other sentences. *See* NRS
14   § 200.030(4) (Eff. October 1, 2007, to June 30, 2013) (listing possible sentences for a
15   person convicted of murder of the first degree).

16          Neither the video, police reports, nor crime-scene photos are evidence that
17   Wright's murder was not willful, deliberate, premeditated, and with malice aforethought.
18   The omitted evidence does not rebut evidence that Garner drove to his estranged wife's
19   place of work in his girlfriend's truck, armed, at 8:00 a.m. Nor does it negate eye-witness
20   testimony that was given during the preliminary hearing that he was seen firing into the
21   passenger's side of Roanna's black BMW as it was driving out from behind the Juke Joint,
22   and then firing into the driver's side after it came to a rest against a generator behind a
23   nearby gas station. (ECF No. 37-41 at 8-9.)

24          An objectively reasonable attorney could anticipate that showing a video depicting
25   Garner arriving at the Juke Joint within seconds of Wright and Roanna and just before
26   the crimes could negatively impact Garner's sentencing. The record reflects that instead

27

28          [5]Garner also pleaded guilty to attempting to murder Roanna "with malice
      aforethought." (ECF No. 37-39 at 1, 11, *accord* ECF No. 37-38 at 9.)

25

of drawing attention to whether the crime was deliberate, premeditated, and with malice aforethought or by lying in wait, defense counsel presented mitigating evidence aimed at showing that Garner's conduct was not the product of a healthy or sober mind. (ECF Nos. 38-14 at 33-34 (Dr. Kinsora's testimony), 59-60 (Dr. Roitman's testimony), 64 (Garner's testimony), 68-71 (defense counsel's colloquy), 38-12 at 6-7 (defense sentencing memorandum), 13-23 (Dr. Kinsora's Assessment of Neurocognition).) Under the totality of the circumstances, the decision not to introduce the surveillance video—not to focus on whether Wright's murder was willful, deliberate, premeditated, and with malice aforethought or by Garner lying in wait—was reasonable. *See Richter*, 562 U.S. at 106 (explaining "'[r]are are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach") (quotation omitted). Given that Garner pleaded guilty to either theory of the crime and both authorize the sentence posed, and considering the weight of the aggravating evidence, it is not reasonably probable that he would have received a lighter sentence had the surveillance video, contents of the police reports, or crime scene photos been introduced during sentencing.

### b.    Garner's mental-health and drug-use histories

Garner faults sentencing counsel for not offering evidence about his mental health and drug use histories. (ECF No. 29 at 30-32.) But as Respondents point out, Garner admits that his trial counsel filed a "Sentencing Memorandum [that] provided information about [Garner's] background, family, and favorable incarceration record." (ECF Nos. 29 at 21, 48 at 15.) Counsel also provided a report from Dr. Thomas Kinsora opining about Garner's mental health issues, which "discussed in great detail [Garner's] family history of mental health issues, including his father's schizophrenia." (ECF No. 29 at 21.) Dr. Kinsora testified at the sentencing hearing about the same matters. (ECF No. 38-14 at 29–51.) Specifically, Dr. Kinsora testified about Garner's genetic link to mental-health disorders, history of paranoia and hypomania, and daily use of alcohol and anabolic steroids at the time of and preceding the crimes. (*Id.* at 33-34.) Dr. Roitman also testified

at the sentencing hearing on Garner's behalf, specifically about the negative effects steroids have on the body and mind. (*Id.* at 51-59.)

Moreover, Garner testified at the sentencing hearing on his own behalf. (*Id.* at 64-65.) He explained that the event was the product of "a prior misunderstanding gone horribly wrong. My misuse of drugs, alcohol[,] and sleep deprivation mixed with my inherited psychological problems [made] for a perfect storm." (*Id.* at 64.) Garner also explained, "I never would have done anything to intentionally hurt Roanna. I didn't know she was in the car because of the tinted windows. The only face I saw was Mr. Wright. She was caught in the crossfires, I attempted to defend myself from what I thought was a real threat to my life from my previous confrontation with Mr. Wright." (*Id.*) Garner's testimony was not cut short, nor was he interrupted. Garner does not argue that he was prevented from or advised against providing more details about his mental state, relationship with Roanna, or drug use and mental health histories. The state court record belies Garner's argument that his counsel failed to introduce mitigating evidence about his mental state or circumstances of the crimes, including his mental health and drug use histories. And there is not a reasonable probability that Garner would have received a lighter sentence had his counsel introduced more evidence about these subjects. *See United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (prisoner is not prejudiced by counsel's failure to present cumulative evidence).

### c.   Roanna's bad-character evidence

Garner faults his attorney for not presenting evidence about Roanna's bad character, which he argues would have supported his contention that he shot Wright out of fear and paranoia and not "out of jealousy and an extreme escalation in his abusive relationship with Roanna." (ECF No. 29 at 30-34.) This part of Ground 3 is not factually supported because, as explained above, the Court cannot consider the new evidence that Garner offers to support it. But in any event, defense counsel's sentencing memorandum explained:

> The relationship between Charles and Roanna was rocky and Charles became involved with Mary Hollaway and a child, Charles, was born from

1      the relationship. Charles attempted to deal with the difficulties created by the relationship with Mary and Roanna ended up arrested and charged with domestic violence for an incident in Tucson on June 18, 2004.

2

3 (ECF No. 38-12 at 5.) The record thus belies Garner's argument that sentencing counsel

4 failed to raise Garner's negative experiences with Roanna. An objectively reasonable

5 attorney could conclude that Roanna's arrest records and evidence about Mary's negative

6 experiences with Roanna were not relevant to show that Garner feared he would be shot

7 by Wright and did not know Roanna was in the car. There is a significant probability such

8 evidence would bolster the State's argument that Garner knew Roanna was in the car

9 and intentionally shot her because of their tumultuous relationship. (ECF No. 38-14 at

10 12.) It was not unreasonable for Garner's attorney not to introduce evidence that tended

11 to make his version of events less credible. There is not a reasonable probability that

12 Garner would have been sentenced to life with the possibility of parole had his counsel

13 introduced evidence about Roanna's arrest and Garner's and Mary's negative

14 experiences with her.

15                **d.    Wright's bad-character evidence**

16      Garner argues that his counsel should have presented evidence about Wright's

17 criminal history, which would have supported Garner's contention that he was afraid

18 Wright was going to shoot him. (ECF No. 29 at 32-33.) The new evidence Garner provides

19 shows that Wright was arrested for battery in 1996 for his conduct during an argument

20 with his then girlfriend; the charge was dismissed when Wright complied with a

21 diversionary agreement. (ECF No. 30-1.) He was arrested in 2000 for possessing

22 marijuana and operating a motor vehicle while intoxicated and received probation. (ECF

23 No. 30-2.) And Wright was arrested in 2002 for assaulting a police officer with a crowbar

24 and battering a person with a flashlight; the charges were dismissed when Wright

25 complied with a diversionary agreement. (ECF No. 30-3.)

26      Although Wright's criminal history includes acts of violence, none involve the use

27 of a gun. So, this evidence does not corroborate Garner's version of events that he shot

28 because he feared that Wright had a gun. Garner admits that he was not aware of Wright's

criminal history at the time of the crimes. (ECF No. 29 at 28.) So this evidence is not relevant to Garner's state of mind at the time of the crimes. An objectively reasonable defense attorney could devise a strategy that does not require introducing evidence of a murder victim's irrelevant criminal history.

The record reflects that Garner presented his version of what happened during sentencing, explaining that the crimes were the product of "a prior misunderstanding gone horribly wrong. My misuse of drugs, alcohol and sleep deprivation mixed with my inherited psychological problems [made] for a perfect storm. . . The only face I saw was Mr.Wright . . . I attempted to defend myself from what I thought was a real threat to my life from a previous confrontation with Mr. Wright." (ECF No. 38-14 at 64.) Garner does not argue that he was prevented or advised against providing more details about the circumstances of the crimes. There is not a reasonable probability the state court would have sentenced Garner to life with the possibility of parole had his counsel introduced evidence about Wright's irrelevant criminal history during sentencing.

Under the totality of the circumstances, the Court finds that Garner has failed to demonstrate that his IATC claim is substantial. The Court is not persuaded that there is some merit to Garner's argument that sentencing counsel fell below the objective standard of reasonableness when it failed to introduce evidence that Garner did not kill Wright while Garner was lying in wait, more evidence about Garner's mental health and drug use histories, or evidence about Roanna's and Wright's bad characters. Nor does the Court find there is any merit to Garner's argument that he probably would have been given a lighter sentence if his counsel had not omitted this evidence. The Court is satisfied that the IATC claim stated under Ground 3 does not deserve further encouragement. Ground 3 is therefore dismissed as procedurally barred from federal review.

## V.    CERTIFICATE OF APPEALABILITY

"State prisoners 'seeking post-conviction relief under 28 U.S.C. § 2254 ha[ve] no automatic right to appeal a district court's denial or dismissal of the petition.'" *Payton v. Davis*, 906 F.3d 812, 817 (9th Cir. 2018) (quoting *Miller-El*, 537 U.S. at 327). "Rather,

1   habeas petitioners 'must first seek and obtain a COA,'" i.e., certificate of appealability.

2   *Payton*, 906 F.3d at 817 (quoting *Miller-El*, 537 U.S. at 327); *see also* 28 U.S.C.

3   § 2253(c)(1); Fed. R. App. P. 22(b)(1); 9th Cir. R. 22-1(a). A district court is required to

4   issue or deny a certificate of appealability when it enters a final order adverse to a habeas

5   petitioner, rather than waiting for a notice of appeal and request for certificate of

6   appealability to be filed. Fed. § 2254 R. 11(a); 9th Cir. R. 22-1(a).

7        Generally, a petitioner must make "a substantial showing of the denial of a

8   constitutional right" to warrant a certificate of appealability. 28 U.S.C. § 2253(c)(2); *Slack*

9   *v. McDaniel*, 529 U.S. 473, 483-84 (2000). Where a district court denies relief on

10  procedural grounds without reaching the underlying constitutional claim, the court applies

11  a two-step inquiry to decide whether a certificate of appealability is appropriate. *See*

12  *Payton*, 906 F.3d at 820. A petitioner must show both that jurists of reason would find it

13  debatable (1) "'whether the petition states a valid claim of the denial of a constitutional

14  right'," and (2) "'whether the district court was correct in its procedural ruling'." *Gonzalez*

15  *v. Thaler*, 565 U.S. 134, 140-41 (2012) (quoting *Slack*, 529 U.S. at 484); *Payton*, 906 F.3d

16  at 820 ("Both components must be met before [the Ninth Circuit] may entertain the

17  appeal.") (citing *Slack*, 529 U.S. at 484-85). To meet the threshold inquiry, a petitioner

18  has the burden of demonstrating that the issues are debatable among jurists of reason;

19  that a court could resolve the issues differently; or that the questions are adequate to

20  deserve encouragement to proceed further. *See Allen v. Ornoski*, 435 F.3d 946, 950-51

21  (9th Cir. 2006). In this case, no reasonable jurist would find this Court's denial of the

22  Petition debatable or wrong. The Court therefore denies Garner a certificate of

23  appealability.

24  **VI.    CONCLUSION**

25        It is therefore ordered that Garner's Second Amended Petition for Writ of Habeas

26  Corpus (ECF No. 29) is denied on the merits as to Grounds 1 and 2 and dismissed based

27

28

1    on procedural default as to Ground 3.[6]

2           It is further ordered that a certificate of appealability is denied.

3           The Clerk of Court is directed to substitute Gabriela Najera for Respondent State

4    of Nevada, enter final judgment accordingly, and close this case.

5           DATED THIS 4th Day of October 2022.

6

7    _____

8    MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    _____

26          [6]Garner requests that the Court conduct an evidentiary hearing. (ECF No. 29 at
      34.) Garner does not explain what evidence would be presented at a hearing, and the
27    Court has already determined which of the new evidence that Garner proffers to buttress
      Ground 3 is precluded by 28 U.S.C. § 2254(e)(2). And the Court determined that Garner
      is not entitled to relief on Grounds 1 and 2 based on the state record, so an evidentiary
28    hearing about those claims is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474
      (2007). Garner's request for an evidentiary hearing is therefore denied.